In the Matter of NEW YORK TELEPHONE COMPANY, Petitioner, against PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent, and CITY OF NEW YORK et al., Intervenors-Respondents.

Third Department, May 24, 1955.

*Henry J. Friendly, Ralph W. Brown, Eric B. Nelson, Robert W. Doyle, Edward L. Friedman, Jr.,* and *Jack A. Haner* for petitioner.

*Kent H. Brown, George H. Kenny, Joseph J. Doran, Lawrence M. De Vore, Charles R. Gibson* and *Martin L. Barr* for respondent.

*Peter Campbell Brown, Corporation Counsel* (*Leo A. Larkin, Morris Handel, James J. Thornton* and *Morris Einhorn* of counsel), for City of New York, intervenor-respondent.

*Frank L. Weil, Ira M. Millstein* and *Milton Haselkorn* for Abraham & Straus and others, intervenors-respondents.

*Edmund B. Naylon, George Foster, Jr.,* and *Edward F. Huber* for Long Island Water Corporation, *amicus curiæ.*

FOSTER, P. J., In this proceeding under article 78 of the Civil Practice Act we are asked to review and annul two orders of the Public Service Commission, which in effect denied the application of the New York Telephone Company for an increase in telephone rates amounting annually to $68,850,000. The issue raised is one of principle, and not of detail with regard to rates. Petitioner's claim of error is that the commission refused to receive evidence of the alleged present value of its property actually used in the public service. This claim of error is based entirely on statutory language.

The statute involved is subdivision 1 of section 97 of the Public Service Law which in substance directs the commission to determine just and reasonable rates for telephone corporations, upon its own motion or on the complaint of a utility. The determination of such rates is to be made, according to the language of the statute "with due regard, among other things, to a reasonable average return upon the value of the property

actually used in the public service ". Petitioner contends that this language was an imperative mandate to the commission, and required it to adopt what is commonly called a present fair value rate basis in passing upon petitioner's request for a rate increase; and the exclusion of evidence which would have been material in the computation of such a rate base was reversible error. The commission on the other hand regards the language quoted as more or less of an historical accident, and without the significance petitioner ascribes to it; and further, that when the concept of present fair value as a rate base was abandoned as a constitutional requirement by the Supreme Court of the United States (*Power Comm.* v. *Hope Gas Co.,* 320 U. S. 591 [1944]) the commission was free to disregard it.

In 1898, and prior to the enactment of the Public Service Law in this State, the Supreme Court of the United States decided the case of *Smyth* v. *Ames* (169 U. S. 466). It there held that a public utility was entitled to receive " a fair return upon the value of that which it employs for the public convenience " (p. 547). That it meant present fair value was made clear in *Willcox* v. *Consolidated Gas Co.* (212 U. S. 19). Such was the celebrated concept which was the *sine qua non* of public utility rate making for over forty years, and remained so until the *Hope* case (*supra*) was decided in 1944. That case merely decided that it was no longer necessary for regulatory bodies to use the concept as a constitutional requirement but of course it did not bar its use, or attempt to dictate legislative policy as to rate making for the individual States beyond the requirement that rates should be fair and reasonable. This is the rule applied to other forms of price fixing.

But what was meant by the term " value " as used in *Smyth* v. *Ames?* It did not mean market value, or exchange value, in the ordinary sense of those terms. Property dedicated to the public service is not ordinarily considered to have an exchange value, for it can neither be freely bought or sold like ordinary commodities, nor withdrawn from the public use. Chief Justice HUGHES recognized this semantic difficulty when he said in *Los Angeles Gas Corp.* v. *Railroad Comm.* (289 U. S. 287, 305): " In determining that basis, the criteria at hand for ascertaining market value, or what is called exchange value, are not commonly available. The property is not ordinarily the subject of barter and sale and, when rates themselves are in dispute, earnings produced by rates do not afford a standard for decision. The value of the property, or rate base, must be determined under these inescapable limitations."

The decision in *Smyth* v. *Ames* did not undertake to define value, nor was any definition attempted by the Supreme Court thereafter. Some of the elements that had to be considered in arriving at a figure of value were stated, and among them reproduction cost as well as original cost, but fair value itself defied precise definition. It was said however in another case that a determination of value must rest on " ' * * * a reasonable judgment having its basis in a proper consideration of all relevant facts ' ". (*Los Angeles Gas Corp.* v. *Railroad Comm., supra,* p. 306). In other words fair value was a special value for rate cases alone, supposed to be arrived at by considering various elements of value, in such weights and proportions as might be just and right in the individual case.

Almost from the date of its announcement this doctrine, which amounted to a constitutional mandate, was heavily criticized by economists and students of utility regulations. (See 2 Bonbright on Valuation of Property [1st ed.], chs. 31, 32.) Some critics advanced the view that a public utility should be limited to a fair return on capital invested irrespective of present value, others advocated the somewhat narrower prudent investment theory. In the Supreme Court itself there were powerful dissents as to method by Justice BRANDEIS in two cases, although in both cases he concurred in the result. (*Southwestern Tel. Co.* v. *Public Serv. Comm.,* 262 U. S. 276; *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38.) Nevertheless a majority of the Supreme Court adhered to the doctrine until the *Hope* case was decided in 1944, and of course the various commissions and courts in this State followed it. It would serve no useful purpose here to cite the long line of administrative and judicial decisions on the subject, for they neither added to nor subtracted anything from the fundamental directive of the Supreme Court. Even when a section of the New York statute was cited it is clear that the over-riding authority was the Supreme Court ruling. Hence I think but little weight can be given to the assertion that the commission and the courts of this State have consistently construed section 97 of the Public Service Law to require a fair value rate base. From 1898 to 1944 they had no other choice.

Such was the constitutional law of the land when in 1910 the Legislature enacted section 97 of the Public Service Commissions Law (L. 1910, ch. 673) relating to telephone companies. (Law now known as Public Service Law, L. 1930, ch. 782.) Earlier, railroads and street railroads, common carriers, gas and electric corporations, had been brought within the purview of the Public Service Law by legislation enacted in 1907 (L. 1907, ch.

429). The standard of just and reasonable rates was prescribed for them without further specification at that time. Prior to that the Railroad Law prohibited any reduction of rates which would reduce profits to less than 10% on capital actually expended. In 1910 section 49 of the Public Service Law was amended to add the provisions that railroad rates should be fixed " with due regard among other things to a reasonable average return upon capital actually expended". At the same time a similar provision was added to section 72 relating to gas and electric corporations (L. 1910, ch. 480). At the same session of the Legislature telephone companies were brought within the regulatory jurisdiction of the commission and the commission was directed in fixing rates for them to give " due regard, among other things, to a reasonable average return upon the value of the property actually used in the public service ". (L. 1910, ch. 673). These seemingly inconsistent directives in statutes adopted at the same legislative session were peculiar enough, but in 1911 section 49 of the Public Service Law relating to railroads was again amended, and " the value of the property actually used " was substituted for " capital actually expended " (L. 1911, ch. 546). The apparent inconsistency between the standard set up in section 72 of the statute relating to gas and electric corporations, and that set up in sections 49 and 97 relating to railroads and telephone companies, was pointed out by the then Governor and he suggested a correction by the Legislature, but nothing was done about it.

Thereafter the Legislature brought steam corporations, omnibus companies, motor carriers and water corporations under regulation by the Public Service Commission, but in none of the enactments concerning these utilities was the term " value " mentioned as a factor in rate making. The " reasonable average return upon capital actually expended " was directed for all except motor carriers and as to these " a reasonable profit " was provided for. (Public Service Law, §§ 63-b, 63-s, 85, 89-j.)

In 1921 the telephone section 97 of the Public Service Law was re-enacted in substantially the same language as that used in the 1910 enactment with regard to an average return upon the value of property actually used in the public service (L. 1921, ch. 335). In 1929 a legislative commission was created to inquire into public utility regulations generally in the State (L. 1929, ch. 673). It seems fair to say that every conceivable economic and legal approach to rate making was explored by that body (Report of Commission on Revision of Public Service Commissions Law [Vol. 1], 1930). After its report the Legislature came up with

a bill which in substance provided that rates should be fixed according to the law of the land (Senate Int. No. 1433 [March 17, 1930]). This measure was vetoed.

I do not regard those legislative episodes as of decisive significance here. With the mandate of the Supreme Court still extant the hands of the Legislature were fettered during that period, and hence its inaction meant little. Related to the situation as it existed after 1944 however I think the report of the legislative commission has decided significance. It must be assumed that the Legislature was then entirely familiar with all of the economic theories concerning rate making because every conceivable method of rate making was discussed before the legislative commission, on which sat some eminent authorities in the field of utility regulation. Hence the failure of the Legislature to act after the *Hope* case was decided in 1944 is of decisive importance. It was then completely free to adopt some other standard that would apply to telephone and railroad companies, other than the concept of a return on the fair value of the property used in the public service. However eleven legislative sessions have come and gone since the *Hope* case was decided, and yet the language of sections 49 and 97 of the Public Service Law, insofar as pertinent here, remains the same. Stronger proof cannot be found to support the conclusion that the Legislature was and is satisfied with such language.

When the Public Service Law was enacted the Legislature was not obliged to use any language with reference to any utility which had to do with either the value of property used or capital expended. In fact in its earliest enactments it merely provided for fair and reasonable rates. The constitutional mandate of present fair value then in vogue was necessarily implied in every section of the statute dealing with rate fixing, whether mentioned or not. The Legislature could have contented itself by continuing to direct merely that rates fixed for any utility should be fair and reasonable, and left the rest of rate fixing to the constitutional mandate, as it had done earlier. It chose not to take that course and its choice must be given significance.

In sections dealing with railroad and telephone companies it used language so closely paralleling the language of *Smyth* v. *Ames* (169 U. S. 466, *supra*) that the only natural, reasonable and logical conclusion one can draw, so it seems to me, is that it adopted the Supreme Court concept in those sections. Its motives for so doing, whether by compulsion or otherwise, I believe to be irrelevant. The question is one of intent, not the motive which may have impelled the intent.

Thus it would seem the words " value of the property actually used in the public service " were used with deliberate intention and design when section 97 of the statute was enacted and re-enacted, and continued with the same force and effect after the *Hope* case was decided by the failure of the Legislature to change them. No other conclusion seems reasonably plausible.

It is argued that the Legislature could have had in mind the use of the terms " value " and " capital expended " interchangeably to mean original cost less depreciation. To accept this argument would be a very convenient way of disposing of the inconsistency between the sections dealing with railroad and telephone companies, and those dealing with other utilities. But it seems very unlikely that the Legislature had any such intent. The cost of property is not the test of its value — it may be worth more or less, or worth and cost may at times coincide (*Cleveland etc. Ry. Co.* v. *Backus*, 154 U. S. 439, 446). This self-evident truth is recognized in common speech irrespective of the decision cited. It must be presumed that the Legislature was aware of the simple distinction. Moreover from the context of the telephone section it is clear that the Legislature in using the word property did not refer to capital. Property is used but capital is expended.

It is true that the word "value " as used in the section under consideration presents a semantic difficulty. Obviously it was not, and is not used in the sense envisaged in ordinary speech, nor can it be accurately and precisely defined. Nevertheless it is a term well understood and applied by rate makers for over forty years. Hence its lack of precision as a term of measurement constituted no bar to following the directive of the section. At least nine other States are now using it as a rate base.* (See decisions made after the *Hope* case was decided.)**

Fairly construed the words " value of the property used in the public service " can only mean present value. The verb " used " in that context is a verb of continuing meaning. It could not refer in any grammatical or logical sense merely to the past. Hence

---

* Pennsylvania, North Dakota, Indiana, Ohio, Maryland, Illinois, Maine, North Carolina and Delaware.

** (*Pittsburgh* v. *Pa. Public Utility Comm.*, 158 Pa. Super. 229; *Northern States Power Co.* v. *Public Service Comm.*, 73 N. D. 211; *Public Service Comm.* v. *Indiana Bell Tel. Co.*, 232 Ind. 332; *Marietta* v. *Public Utilities Comm.*, 148 Ohio St. 173; *Chesapeake & Potomac Tel. Co.* v. *Public Service Comm.*, 201 Md. 170; *Illinois Bell Tel. Co.* v. *Illinois Commerce Comm.*, 414 Ill. 275; *New England Tel. & Tel. Co.* v. *Public Utilities Comm.*, 148 Me. 374; *State ex rel. Utilities Comm.* v. *State*, 239 N. C. 333.)

whether we take the language of section 97 as an adaptation of the Supreme Court rule before the *Hope* case was decided, or language which the Legislature framed entirely on its own, reproduction cost less depreciation is an indispensable ingredient to be considered in fixing the present value of property actually used in the public service. This is so because it is not possible, or at least not practicable, to prove market or exchange value. Reproduction cost can only be shown by opinion evidence, and it is that type of evidence which the commission rejected.

The commission regarded the inconsistency between the " capital actually expended " language of section 72 (gas and electric companies) and the " value " language of sections 49 and 97 (railroad and telephone companies) as of decisive importance. It said in its opinion: " It is inconceivable, at least to this Commission, that the legislature of this state intended that telephone rates should be fixed at any different standard than those of electric, gas or water utilities." The difficulty with this statement and the argument implied, is that on the face of it the Legislature has done the very thing the commission deems to be inconceivable. The history of the railroad section 49 emphasizes this point. In 1910 the Legislature directed that rates should be fixed with due regard to " capital actually expended ". A year later the section was amended and " the value of the property actually used " was substituted for " capital actually expended ". That substitution does not suggest an historical accident. Unless the Legislature was toying with words it is impossible to escape the conclusion that it intended to set up a different standard for some utilities.

On the other hand to adopt the commission's view means reading into section 97 language that is not there, i.e. " capital actually expended " and discarding language that is actually there, i.e. " value of the property actually used in the public service". This, in my opinion, is beyond the power of the commission and the courts, for it amounts to legislation, not construction. The quoted language in section 97 must be given a rational meaning. It cannot be discarded altogether unless one takes the view that with the decision in the *Hope* case the Legislature abandoned it. Such an extreme position has no precedent judicial or otherwise to support it; and the lack of such support cannot be overcome by books and treatises on rate making, however learned and persuasive they may be. Manifestly if the Legislature changed its mind with the decision in the *Hope* case it would have so indicated in a fashion that would be unmistakable.

Therefore we begin and end on this phase of the matter with the proposition that the Legislature has apparently treated utilities differently for rate-making purposes. Whether it had power to do so is an issue not now before us. So far as this review is concerned we are only called upon to determine the obligation of the commission under section 97 of the Public Service Law. The issue as to what duties the commission may have under other sections of the statute, which do not in terms refer to a return upon value, must be reserved for another day.

The commission also took the view that the language of section 97 is not mandatory, although it concedes that some rate base or formula is necessarily implied. I feel impelled to differ from this view for I cannot see how a mandate could be more clearly stated. The commission undoubtedly has rather wide discretionary power as to rate making even under section 97, as the statutory language indicates, but it could not give " due regard " to the value of property actually used in the public service if some proof of that measure were not before it. Opinion testimony from an expert on utility regulation cannot serve to determine an issue of legislative intent where the language of a statute is reasonably clear.

The commission also cites the reorganization provisions of the statute (§§ 101-a, 60-a) to show that when the Legislature wished to direct a fair valuation rate base it did so in unequivocal terms. These sections provide in substance, although at greater length than section 97, that fair value shall be the standard for recapitalization. I see nothing in them that supports the position of the commission. It is not reasonable to assume that the legislative intent was to deny a fair value standard for rate making, and yet direct such a standard to be used for reorganization and recapitalization purposes. If any intent is to be drawn from these sections it tends to support the position of petitioner rather than the commission.

Two other enactments are cited by the commission to support its contention that the legislative intent was merely to direct a fair return on capital actually expended. One is the abolition of a bureau of Valuation and Research, formerly a part of the commission (L. 1950, ch. 465, repealing former section 4-a of the Public Service Law); and the other has to do with amendments to the Condemnation Law (L. 1952, chs. 508, 515). The legislative background for the bill abolishing the Bureau of Valuation and Research appears scant, but in any event the abolition of a bureau in 1950 can hardly serve any constructive purpose in

ascertaining the legislative intent of an act passed in 1910. For what it may be worth it should be pointed out that no change was made in section 18-a of the Public Service Law which requires a utility to pay for valuations made by the commission.

The 1952 amendments to the Condemnation Law do not seem at all germane to the problem involved in this proceeding. It may also be said of them that they serve no useful purpose in construing legislative intent as it existed in 1910. Moreover, the legislative findings and intent preceding the amendments plainly state that they were enacted to prevent excessive condemnation awards, and " without attempting to mandate the base of valuation to be followed ", to point out the desirability of capitalizing the income which a private company could be expected to earn from rates fixed " among other things " to a reasonable return upon capital actually expended. (See note, McKinney's Cons. Laws of N. Y., Book 9-A, Condemnation Law, § 5-a.) I can see no connection between this language of an entirely different statute and section 97 of the Public Service Law. Again, at the risk of repetition, it is suggested that if the Legislature wanted to change the apparent meaning of section 97 it would not have taken any such obscure and uncertain method of indicating its intent.

In view of the foregoing I think petitioner's contention is sound and cannot be justly disregarded from a legal viewpoint. The issue is not whether the section in dispute provides the best method for rate making in accordance with the views of economists, but rather the intention of the Legislature as expressed in a specific section. Courts should not feel impelled to give a strained construction to statutory language in order to serve some particular economic viewpoint, however forward looking such a veiwpoint may appear to be. If there is doubt that statutory language is up to and in conformity with the spirit of the time the resolutive remedy is absurdly simple — the Legislature can affirm, amend or repeal it. In a field that is primarily a legislative function, such as rate making, the choice should be left to the Legislature and not imposed by judicial construction in the absence of a constitutional requirement.

It is not necessary to go into detail with regard to the proof offered and rejected because the commission concedes that if petitioner's major premise is correct its conclusion may be said to follow.

The orders should be annulled, with $50 costs and disbursements, and the matter remitted to the commission.

BERGAN, J. (dissenting). The opinion of Justice HALPERN exposes the atmosphere of thin rationalization which underlies the Telephone Company's argument that the words " value of the property " as used in the New York statute mean a " value " which is to be reached by resort to reconstruction cost. Nowhere has it been better demonstrated than he has done here, that the word " value " standing alone did not mean in 1910 when the statute was enacted and does not now mean the term of weighted special implication which lawyers and economists attached to *Smyth* v. *Ames* (169 U. S. 466 [1898]) and which had acquired the technical name of " fair value". These terms which have a similar sound, have a sharp dissimilarity in meaning, historically and legally, as his opinion shows in a clear logical sequence and I concur in it. I add some additional general observations which lead me to vote to confirm the order of the Public Service Commission.

The purpose that lies squarely at the bottom of the public regulation of a telephone rate in New York is to bring it about that " All charges " for service " shall be just and reasonable". (Public Service Law, § 91.) Everything that implements this or affords a procedural means to implementation, as for example, the requirement of subdivision 1 of section 97, that due regard among other things be given to the value of the property used ought to be read with that legislative purpose held closely in view.

Precisely this same term — " just and reasonable " — also dominates the purpose of the Federal statute (Natural Gas Act, § 5; U. S. Code, tit. 15, § 717d), a reading of the words of which led to the constructions in 1942 (*Power Comm.* v. *Pipeline Co.,* 315 U. S. 575) and in 1944 (*Power Comm.* v. *Hope Gas Co.,* 320 U. S. 591) that abandoned the judicially imposed requirement that had lasted from the end of the nineteenth century, that in ascertaining " value " of utility property for the purpose of rate making, weight must be given to " the present as compared with the original cost of construction " (*Smyth* v. *Ames, supra,* p. 546).

A word used in a legislative procedural prescription for judicial or quasi-judicial action in the future is not some rigid and metallic point. It is, rather, a point of reference which may change, and will be expected by the Legislature to change in actual practice with the needs, conditions and viewpoints which call up its application. This would be so especially of an expression such as " value of the property ", cast by the Legisla-

ture in subdivision 1 of section 97 of the Public Service Law, in a setting of unusually guarded words.

There is nothing about this to lead one to think that the Legislature meant to freeze forever into New York law one of the long list of elements which a Supreme Court opinion written over half a century ago by Mr. Justice HARLAN set forth in support of the logic of the judgment that the court was then entering on constitutional grounds in *Smyth* v. *Ames* (169 U. S. 466, 546, 547, *supra*). The same court accorded no such immutability to the definitive words of 1898 when those very words were treated in 1944 as no longer an essential criterion, or even a workable basis, for modern rate making. (*Power Comm.* v. *Hope Gas Co., supra.*)

The standard of 1898 had, in the intervening years, undergone an usually rigorous assault by lawyers and economists alike who saw no sense to tying rate making to the shifting standards involved in attempting to ascertain what a theoretical new cost of the utility enterprise would be from time to time and working all this into rates to be paid by the consumer.

One of the chief critics of the rule of 1898 was Mr. Justice BRANDEIS. In the concurring opinion in *Southwestern Tel. Co.* v. *Public Serv. Comm.* (262 U. S. 276) in which Mr. Justice HOLMES joined, he expressed the view that under the doctrine of *Smyth* v. *Ames* not only is effective judicial review often rendered impossible (p. 296) but that " inherent in the rule itself, is arbitrary action, on the part of the rate regulating body " (p. 297). He noted that even then [1923] State utility commissions while admitting evidence required by the rule " failed, in ever-increasing numbers, to pay heed to it in fixing the rate base " (p. 301).

Criticism of the rule appeared on a broad front. It was all bu⁴ universal. (See for example Hale, Fair Value Merry-go-Round, 33 Ill. L. Rev. 517; Henderson, Railway Valuation and the Courts, 33 Harv. L. Rev. 1031, 1051; 2 Bonbright on Valuation of Property [1st ed.], pp. 1094 *et seq.*, pp. 1152, 1154; the dissenting opinion of Mr. Justice STONE in *West* v. *Chesapeake & P. Tel. Co.* [295 U. S. 662, 680]; the dissenting opinion of Mr. Justice BLACK in *McCart* v. *Indianapolis Water Co.* [302 U. S. 419, 423 *et seq.*]; and the concurring opinion of BLACK, DOUGLAS, and MURPHY, JJ., in *Power Comm.* v. *Pipeline Co.* [315 U. S. 575, 599 *et seq. supra*], where the Justices adverted to the " havoc " raised by the rule [p. 605].)

Even if the New York Legislature felt itself bound in a constitutional sense in 1910 when it used the term " value of the

property actually used in the public service '' to regard one component of '' value of the property '' as present cost because of the language of the Supreme Court's opinion in 1898, it must be deemed to have done so with the reservation that if, after many years, the Supreme Court changed its notion of the essential criteria of value, the New York Public Service Commission would have the same freedom of construction of the word '' value ''.

It ought to be kept in mind, however, that the Legislature did not enact the words of Mr. Justice HARLAN literally into a New York statute. He had some other things to say about what he thought were '' matters of consideration '' which no one would say the New York Legislature meant to include in '' value of the property '' when it was used in our statute. He thought, for example, that the market value of the utility's bonds and the market value of its stock should be reflected in the calculation of the rates to be charged the public (169 U. S. 466, 546, 547). He thought that the '' amount '' of its bonds should be reflected.

It can scarcely be thought that the Legislature took that literally and it did not enact literally a requirement addressed to the Public Service Commission that it must take more implicitly one of the other items on his list of criteria, that '' the present as compared with the original '' cost of construction must be considered. The Legislature, on the contrary, enacted a statute in general words addressed to '' value '' and left open in this respect the method of determining value to the commission. The constrictive definition is a court-made and not a legislative-made constriction and the court that made it has now flatly disavowed it.

It makes a hard case to say that if the Supreme Court itself was able to look at the constitutional requirement of '' value '' differently in the space of half a century, nevertheless the Public Service Commission will always be required to continue to look at the word only by the measure of an abandoned judicial standard. What '' value '' the property has was delegated by the Legislature wholly to the commission to determine and everything about the delegation of power suggests broad procedural freedom consistent with due process.

The definition of a word, even when the word finds its way into a statute, cannot be so solidly encased in meaning that it never changes. When people who use the word in private intercourse or apply it in public action come after a long time to look at it in a new way, its meaning, either in nuance or in emphasis, is different.

A present-day " due " regard for " value of the property " would suggest the usual meaning that people would give to it in 1955. They would not necessarily look at the thing the way they did in 1898; and the Legislature gave a sufficiently flexible context to the statutory words to admit of the change.

Even if this court might think that " value of the property actually used " could be read only to include a consideration of the theoretical present cost of the plant, rather than what the Public Service Commission thinks it means, it is still not easily to be said that the commission's view of meaning is so grossly wrong that its determination in this rate case has to be annulled. A reasonable difference in viewpoint on such a question of definition between the commission and the court would, of course, have to be resolved in favor of the commission under familiar principles of administrative review.

A recent survey of decisions of State regulatory commissions and of State courts since *Power Comm.* v. *Hope Gas Co.* indicates how impractical the rule of *Smyth* v. *Ames* was in administration, and how readily the opportunity to abandon its handicaps was seized upon by the States. (Rose, Hope Case and Public Utility Valuation, 54 Col. L. Rev. 188 [Feb. 1954]). Of forty-three States studied, nineteen have explicitly changed from fair value to original cost or prudent investment. Four States had used this method before the *Hope* case and continue to use it; and eight use original cost as the measure of fair value. Nine continue to follow the older meaning of value. The " disintegration of the fair value formula " it is noted in the survey (p. 212) " has been rapidly accelerated by the *Hope* decision ".

An example of the judicial utilization of the *Hope* case by a State as a new exit to freedom from the restraint of the " fair value theory " long imposed by *Smyth* v. *Ames,* under a statute somewhat similar to the Natural Gas Act, is *Utah Power & Light Co.* v. *Public Service Comm.* (107 Utah 155 [1944]). The Utah statute authorized but did not require the commission to consider value of the property used in the public service to arrive at rates; but by long judicial and administrative construction the legislative mandate to the commission to fix " just, reasonable or sufficient rates " (Utah Code, 1943, § 76-4-4) had been held to require consideration of fair value under the necessities imposed by *Smyth* v. *Ames.* The Natural Gas Act on which the decision in the *Hope* case was based contained a somewhat similar power to determine " value ", although the rates were to be just and reasonable.

The Utah Supreme Court was of opinion that no legislative recasting of words thus construed and enacted by the Legislature with the requirements of *Smyth* v. *Ames* in mind was needed to permit the commission to abandon the policy of proof it had followed under compulsion. With the compulsion removed a new definitive freedom arose. We would be well advised in New York to follow the implications of this decision even though there exist those differences in statutory structure which have been noticed.

New York has no such compelling ties with the dead past as to accept willingly a crippling, and quite unnecessary, limitation on its freedom to regulate a telephone utility by fixing a fair and reasonable rate; nor has it any compulsion to be required by judicial construction to stand in the company of States which seem for the moment to continue to deem this limitation on public power necessary because of very narrow views of statutory construction or for other reasons.

The petitioner persistently treats the statutory words " value of the property actually used " as though these words have to mean, and could mean only, the present theoretical cost of acquiring and now putting together a new utility plant. No one, and particularly not the telephone company, has any thought of doing any such theoretical thing. The value the petitioner thus contends for in effect is not the value of property " actually " used, the cost of which is known because it was actually paid out, but the value of idealized property conceived in the web of hypothesis and bought in theory.

Of course the words " value of the property actually used " have no such intrinsic meaning as used in this context; and no sensible man free to infer a meaning that common words would commonly carry with them would necessarily think they meant any such thing. The construction that " value of the property actually used " means present cost of putting a theoretical utility together was a construction employed by judges and lawyers; but it was employed by them under constraint.

It was a construction bent into place by the pressing force of *Smyth* v. *Ames*. Its artificiality and its hopeless ineptitude for the regulation of telephone rates ought not to survive when that force has been released. We certainly should not by sheer habit continue to pay blind homage to a dead constraint.

If one addresses oneself in turn to the realities which lie below this dispute about what words in the statute mean, it would seem awkward and unworkable to regulate the rates to be charged by a gigantic utility by a consideration of the ever-

shifting level of what it would cost at any particular time to acquire and put together the property used in the public service.

This kind of value never stands still. Which of its gyrations would be reflected in the rates, and how deep the thrusts of rise and fall would be permitted to cut into the rates, would be so much a matter of judgment and degree, and so reflective of the imagery of hypothesis expounded on the witness stand, that public regulation could easily find itself held by no firm anchor.

It is said on the argument in this court that not all slight changes in value would be reflected in rates, but only those which are substantial; but, of course, with property of this magnitude it would not be hard to illumine any change in value as being substantial. There are, perhaps, " plateaus " of economic values in terms of dollars which will not ever be penetrated downward, and it is said that the clearly visible strata in these plateaus would be safe enough lines at which a regulatory commission would undertake to reflect new levels by authorizing new rates.

But the area of economic thinking to which these theories have a relevancy is not quite an exact science. The work of Keynes, a leading economic theorist of this century suggests through his active life constant shifting and recasting of economic views. (Cf. Harrod on The Life of John Maynard Keynes [1951]). Much that he thought one year he put aside or treated differently in the next or succeeding years. The spot where the economy, in irreversible movement, reaches a plateau of value; as well as the theoretical cost of putting together a huge public utility at any given moment, are both matters of how a man thinks, and how he arranges and rearranges the materials of his experience to form his final judgments.

We are freed of *Smyth* v. *Ames* and we ought not impose a new judicial restraint on the New York Public Service Commission against its own view of the problem by creating an inescapable duty of integrating such vague elements into the telephone rate. The Legislature has given to the commission, and it has not given to the court, the responsibility to fix a rate that will be " just and reasonable ".

The orders should be affirmed.

HALPERN, J. (dissenting). The general constitutional background of the problem is set forth in the opinions of Presiding Justice FOSTER and Justice BERGAN but, in view of the fact that we are here concerned with the construction of a statute enacted in 1910, it may be useful to trace the development of the "fair

value" doctrine in greater detail, with emphasis upon the dates of the relevant decisions.

In 1898, in *Smyth* v. *Ames* (169 U. S. 466, 547) the United States Supreme Court, in an opinion by Mr. Justice HARLAN, held that, under the due process clause of the United States Constitution, a public utility company was entitled to a fair return upon the " fair value " of its property and that in determining the " fair value " both " the original cost of construction " and " the present cost as compared with the original cost of construction " (which came to be known as reproduction cost) were to be considered, together with other factors. The court did not specify the weight to be given the original cost and the present cost respectively. Each of the factors was " to be given such weight as may be just and right in each case". It may be noted, however, that original cost was listed first in the factors to be considered. In practice, under the " fair value " rule, as first formulated, original cost was considered the principal measure of value and evidence of reproduction cost was received chiefly as a check upon the reasonableness of the figures claimed by the company to represent the original cost. Compare *San Diego Land Co.* v. *National City* (174 U. S. 739, 757 [1899]) per HARLAN, J.: " The property may have cost more than it ought to have cost, and its outstanding bonds for money borrowed and which went into the plant may be in excess of the real value of the property". Items of actual expenditure which were not reflected in " real value ", i.e., property of usefulness in the public service, were to be rejected.

In the days when book records were inadequate and when wasteful and extravagant expenditures were freely made, proof of reproduction cost was regarded as a good way to determine what the actual cost was. " Estimates of reproduction costs were then offered, largely as a means, either of supplying lacks in the proof of actual cost and investment, or of testing the credibility of evidence adduced, or of showing that the cost of installation had been wasteful " (BRANDEIS, J., *Southwestern Tel. Co.* v. *Public Serv. Comm.*, 262 U. S. 276, 298–299).

It had been argued on behalf of the consumers in *Smyth* v. *Ames* that, where the reproduction cost was less than the original cost, by reason of a decline in the general level of prices, the lower figure should be taken as the sole factor in determining the rate base (cf. *Steenerson* v. *Great Northern Ry. Co.*, 69 Minn. 353 [1897]). But this was rejected by the court and the court

annulled the rates prescribed by the Nebraska Legislature upon the ground that they did not provide a fair return upon " fair value ", in accordance with the rule laid down by the court, which required consideration of both original cost and reproduction cost. " Threatened with the sweeping away of a large portion of their investment by the contention of the state in *Smyth* v. *Ames* and by those very few decisions — such as *Steenerson* v. *Great Northern Ry. Co.* — in which the court said, ' the material question is not what the railroad cost originally, but what it would now cost to reproduce it,' the railroads were at first very glad to accept the compromise of *Smyth* v. *Ames,* which rejected the doctrine of the *Steenerson* case." (Goddard, Problem of Valuation — Evolution of Cost of Reproduction as the Rate Base, 41 Harv. L. Rev. 564, 566 [1928].)

While the price level remained fairly stable from 1900 to 1910, there were occasional instances in which the current cost of reproduction was in excess of the original cost and in those cases the parties changed sides and the utilities were the ones who insisted upon consideration being given to reproduction cost. Claims of this character were touched upon in *Willcox* v. *Consolidated Gas Co.* (212 U. S. 19, 52 [1909]). While it upheld the gas rates prescribed by the New York State Legislature, the court in a dictum said that, as a general rule, " If the property erty  *  *  *  has increased in value since it was acquired, the company is entitled to the benefit of such increase ", but the court continued : " We do not say there may not possibly be an exception to it, where the property may have increased so enormously in value as to render a rate permitting a reasonable return upon such increased value unjust to the public. How such facts should be treated is not a question now before us ".

This is the stage of development which the " fair value " doctrine had reached in 1910, when the statutory provision relied upon by the petitioner was adopted. The prevailing doctrine was that, as a matter of constitutional law, a public utility company was entitled to a return upon " fair value ", which was to be determined as a matter of judgment, after consideration of all factors. Original cost was recognized as one of the principal factors to be considered. Ordinarily, an increase in value subsequent to the construction or acquisition of the property was also to be given consideration but the question was still open as to whether such an increase might not be disre-

garded, if the increase in value was so great " as to render a rate permitting a reasonable return upon such increased value unjust to the public ".

The leading text of that period was Whitten on Valuation of Public Service Corporations published in 1912. At page 40, Mr. Whitten stated: " there is as yet no authoritative determination of what constitutes fair value. The entire subject is in a developmental stage."

In the period of sharply rising prices, during and after the first World War, the utility companies demanded that reproduction cost be treated as " the dominant element " in the determination of " fair value " and, to a large extent, the United States Supreme Court yielded to this demand, notwithstanding its refusal to adopt that view in a period of depressed prices in 1898.

The apotheosis of the reproduction cost theory was reached in *McCardle* v. *Indianapolis Co.* (272 U. S. 400 [1926]). The language of the court in that case indicated that reproduction cost was to be considered as virtually the sole element in determining " fair value ". But the court retreated from this extreme position in subsequent cases, reverting to the view that " fair value " was a judgment figure to be arrived at in accordance with what seemed just in each case, taking into consideration both original cost and reproduction cost. (*Los Angeles Gas Co.* v. *Railroad Comm.*, 289 U. S. 287 [1933]; *Railroad Comm.* v. *Pacific Gas Co.*, 302 U. S. 388 [1938]; cf. Minnesota Rate Cases, 230 U. S. 352 [1913], and *Georgia Ry.* v. *Railroad Comm.*, 262 U. S. 625 [1923].)

The " fair value " formula, throughout its history, was the subject of wide-spread criticism by economists, legal scholars and other students of public utility regulation. A sampling of these criticisms is given in Justice BERGAN's opinion. It was pointed out that, insofar as the doctrine allowed the utility company a return upon a higher cost of reproduction, attributable to a rise in the general price level, it was unjust to the consumers, since it required them to pay more than a fair return upon the actual investment which had been made by the utility company. It gave the owners of the common stock, or the equity in the enterprise, a return upon an unrealized, hypothetical capital gain, in disregard of the fact that the property had been dedicated to the public use at the time of its original construction, and at its then value. This windfall profit inured solely to the benefit of the holders of the common stock; other investors, the holders of the bonds and preferred stock, were

not given any part of it although their investment might be greater than that of the common stockholders.

Furthermore, if the utility companies' reproduction cost theory were strictly carried out, all the investors would be put in jeopardy, since in a period of declining prices the reproduction cost might be far below the actual investment and, if the earnings of the company were limited to a return upon the lower amount, the company might be unable to pay the carrying charges upon the investment and might even be forced into bankruptcy. Utility companies nevertheless insisted upon dominant consideration being given to reproduction cost in periods of rising prices, confident that in a period of decline a return would be allowed upon the original cost or actual investment, notwithstanding the lower reproduction cost. In their thinking, the " fair value " formula thus became one of " reproduction cost of the utility or prudent investment, whichever is the higher " (*Southwestern Tel. Co.* v. *Public Serv. Comm.*, 262 U. S. 276, 311, *supra,* BRANDEIS, J.).

The worst feature of the " fair value " formula was that it made every rate case a battle of experts who offered widely differing opinions as to the reproduction cost of the plant at current prices. The rate base thus became a fluctuating and uncertain one and its determination was productive of such prolonged litigation that regulation was hamstrung.

Throughout this period, the overwhelming majority of economists and legal scholars favored the exclusive use of original cost in determining the rate base, pointing out that it was fair to both the investor and the consumer and that it provided a stable, readily ascertainable rate base, which greatly facilitated effective regulation. It was further pointed out that, insofar as an increase in the public utility company's margin of profit might be required, because of inflation or other economic factors, in order to enable the company to attract additional capital, an appropriate adjustment might be made in the percentage rate of return, without affecting the stability and certainty of the rate base.

Finally, on January 3, 1944, in *Power Comm.* v. *Hope Gas Co.* (320 U. S. 591) the United States Supreme Court squarely overruled *Smyth* v. *Ames* and all its progeny and held that a rate base valuation determined solely upon the basis of original cost complied fully with the requirements of due process.

Upon the basis of original cost, the Public Service Commission in the present case found that the company's intrastate rate base was about $1,230,000,000. Using this rate base, the commission

found that no rate increase was justified. On the other hand, the petitioner claimed that the " fair value " of its property, taking into account the reproduction cost of its plant at current price levels and the increase in the market value of its land, was $380,000,000 in excess of its original cost. (All the figures for original cost and reproduction cost were, of course, net figures after the deduction of appropriately computed depreciation.) A 6% return upon the amount of the excess over original cost would be $22,800,000 and, in order to afford the company this additional return, after allowing for the Federal income tax, additional revenue of over $47,500,000 would have to be provided.[1]

The petitioner claims to be entitled to this additional return because of the presence in subdivision 1 of section 97 of the Public Service Law of the provision that in determining just and reasonable rates, the Public Service Commission shall give " due regard, among other things, to a reasonable average return upon the value of the property actually used in the public service ". The petitioner does not ask this court to hold that the fixing of its rates upon the basis of original cost is unconstitutional or that it is unfair or unreasonable. Neither does it ask us to find that rate making on that basis interferes with the successful operation of its business or with the attracting of necessary additional capital. (Cf. *Power Comm.* v. *Hope Gas Co.*, 320 U. S. 591, 605, *supra.*) The argument is a wholly legalistic one, based solely upon the petitioner's construction of the quoted words. It is these words which the petitioner claims entitle it to receive about $47,000,000 per year more than it has been allowed by the Public Service Commission. Similar

(1) The alleged increase in current value referred to above relates only to the portion of the petitioner's property allocable to intrastate business. Presumably a corresponding increase would be claimed in the current value of the property allocated to interstate business but the petitioner can make no claim for a higher rate base on account of that increase, because its rates for interstate business are fixed by the Federal Communications Commission upon an original cost rate base. The statute (U. S. Code, tit. 47, §§ 201, 205) provides that telephone rates are to be " just and reasonable ". The company's books are required to be maintained upon the basis of original cost (*United States* v. *New York Tel. Co.*, 326 U. S. 638). Section 213 of the Federal statute authorizes the commission to require a telephone company to file an inventory of its property showing the " estimated cost of reproduction " and also to file a statement showing " the original cost at the time of dedication to the public use " (subds. [b], [c]). The rate making and valuation provisions are similar to the provisions with respect to gas companies in the Natural Gas Act, which were before the court in *Power Comm.* v. *Hope Gas Co.* (320 U. S. 591, 601, footnote 8). Under that statute, it was held that the commission had the right to fix rates on the basis of original cost.

language is to be found in section 49 of the Public Service Law with respect to the rates of railroad companies but all the other rate-making provisions of the Public Service Law, with respect to gas, electric, water, steam and omnibus companies, use the words "with due regard among other things to a reasonable average return upon capital actually expended". (Public Service Law, §§ 72, 85, 89-j, 63-b.)

The petitioner contends that, by the use of the word "value" in the telephone and railroad articles, the Legislature froze into the New York statutory law the requirement that reproduction cost be considered in determining the rate base, without regard to the fate of the constitutional doctrine from which this requirement is alleged to have been derived. Under the petitioner's reasoning, this statutory requirement would be applicable only to telephone and railroad companies, the statutory provisions governing other public utilities clearly authorizing the use of an original cost rate base.

The issue in this case is thus a narrow one. Did the Legislature, by using the word "value" in 1910 in section 97 of the Public Service Law, intend to adopt as a statutory standard the requirement that reproduction cost be considered in determining the rate base, so that the requirement would remain in effect even though the United States Supreme Court should repudiate it? And did the Legislature intend to bring about this result for telephone and railroad companies, notwithstanding the fact that it had specifically approved, so far as the State law was concerned, an original cost rate base for all other utility companies?

## I

### Value and Original Cost

The use of the word "value" as a word of the English language is obviously not sufficient of itself to bring about the result asserted by the petitioner. "Value is a word of many meanings" (*Southwestern Tel. Co. v. Public Serv. Comm.*, 262 U. S. 276, 310, *supra*, BRANDEIS, J.). The word "value" has so many meanings that it can fairly be said that it includes "any monetary statement about property". (May on Financial Accounting, p. 86; Bonbright on Valuation of Property [1st ed.], Vol. I, p. 38, Vol. II, pp. 1083–1084.)

Certain concepts of value are obviously inapplicable to public utility property. Exchange or sale value is not applicable to a public utility plant since such plants are not ordinarily bought and sold with sufficient frequency to establish a market or

exchange price. Furthermore, public utility property is dedicated to the public use and, once dedicated, it cannot be sold without the Public Service Commission's consent nor can it be withdrawn from the public service without authorization by the Public Service Commission (*Spring Brook Water Co.* v. *Village of Hudson Falls,* 269 App. Div. 515, motion for leave to appeal denied, 295 N. Y. 993; *New York Tel. Co.* v. *Jamestown Tel. Corp.,* 282 N. Y. 365; Public Service Law, § 54, subd. 1; § 63, subd. 1; §§ 70, 83, 89-h, subd. 1; § 99).

The principal measure of the value of an unregulated business is its earning power but this is obviously not available as a method of determining the value of a public utility plant for rate-making purposes. The earnings of a public utility depend upon the rates allowed by the regulatory authority and any attempt to determine the value of the public utility's property upon an earnings basis is therefore a circular process; value for rate-making purposes cannot depend upon earnings since earnings are in turn dependent upon the rate base valuation. In order to escape from this circular process, some element of cost must be considered in determining the value of public utility property for rate-making purposes, although it must be recognized that cost has no necessary relation to value in any commercial sense and property which may have cost a great deal to build and which could be reproduced only at a still higher cost may be worthless commercially, if it is unable to produce earnings. We must, therefore, take some form of cost as the measure of value of a public utility plant for rate-making purposes, even though for other purposes, such as tax assessment, it may be said, as the Supreme Court said in the case cited in Presiding Justice FOSTER's opinion, '' the cost of a thing '' is not '' the test of its value '' (*Cleveland etc. Ry. Co.* v. *Backus,* 154 U. S. 439, 446).

Starting with the premise that we must take some form of cost as the measure of value, it is clearly permissible to take the original cost or the actual cost of construction as the standard. The word '' value '', as applied to a public utility plant, is certainly broad enough to embrace original cost as the standard of value. The actual cost of a utility plant is its value, at the time of its construction, provided that the construction was carried out prudently and that there was no wasteful expenditure of funds. The cost of reproducing the plant in the light of changed price levels may also be a permissible measure of value. Thus it cannot be gainsaid that, considering the word '' value '' simply as a word of the English language, either original cost

or reproduction cost or an intermediate figure might be the standard of value of a public utility company. Therefore, the use of the word " value " in a statute regulating public utility rates is not inconsistent with the adoption of an original cost rate base.

Neither is the use of the word " value " in conjunction with the other words in the phrase " the value of the property actually used in the public service ", inconsistent with an original cost rate base. The phrase " used in the public service " is the equivalent of " dedicated to the public use ". The property of a public utility company is dedicated to the public service when construction of the property is completed and it is first used in such service. The property must be deemed to have been dedicated at its value at the time of dedication. The value of the property at that time is ordinarily the cost of its construction. Hence, the phrase " the value of the property actually used in the public service " may reasonably be construed to mean " the value of the property at the time of its dedication to the public service ", which would be determined ordinarily by its actual or original cost.

Certainly, in 1910,[2] the phrase "value of the property actually used in the public service " could reasonably be taken to mean its actual or original cost. In fact, in 1910, it was maintained by the leading authority on the subject of public utility valuation that: " Actual cost properly considered is

(2) We are concerned here with the meaning of a statutory provision adopted in 1910. The subsequent re-enactments of the statute in 1921 are of no materiality (L. 1921, chs. 134, 335). Chapter 134 of the Laws of 1921 was a general revision of the Public Service Commission Law, as it was then known. The amendment to subdivision 1 of section 97 is of no materiality here. The principal change was the addition of a provision for temporary rates which was subsequently held to be unconstitutional (*Prendergast* v. *New York Tel. Co.,* 262 U. S. 43). Chapter 335 of the Laws of 1921 re-enacted subdivision 1 of section 97 without any change, except to rescind certain verbal changes which had been made by the earlier chapter of the laws of the same year and to restore the language to its original form. Throughout this process of amendment, the words relied upon by the petitioner remained unchanged. Under section 95 of the General Construction Law, " The provisions of a law repealing a prior law, which are substantial re-enactments of provisions of the prior law, shall be construed as a continuation of such provisions of such prior law, modified or amended according to the language employed, and not as new enactments ". As was held long ago, " A re-enactment of a previous statute is both by the settled law of adjudged cases as well as by the provisions of the General Construction Law (Consolidated Laws, chap. 22, * * * § 95) deemed not a new law but the continuation of the former law. In determining its meaning it must be found out what was intended by the prior enactment ". (*People ex rel. Donegan* v. *Dooling,* 141 App. Div. 31, 32–33.)

the most natural and in many respects the fairest single basis for the determination of fair value for rate purposes.  *  *  * The measure of the property devoted to a public use is undoubtedly in the first instance, at least, the money that the company has actually and necessarily invested, *i.e.*, the actual cost'' (Whitten on Valuation of Public Service Corporations [1912], § 96, p. 83).

Once it is recognized that an original cost rate base falls within the range of the permissible meanings of the term '' value of the property '', as used in section 97, it follows readily that the Public Service Commission had the right to adopt that interpretation. Where words of broad meaning are used in a regulatory statute, the administrative agency charged with the enforcement of the statute has the right to interpret them and the agency's interpretation is binding if it has a rational basis (*Matter of Mounting & Finishing Co.* v. *McGoldrick*, 294 N. Y. 104).

Furthermore, apart from the weight to be given to the commission's determination, the interpretation which authorizes the use of an original cost rate base is the only one which renders the telephone and railroad sections consistent with the rest of the Public Service Law and with the settled rate-making policy of the State. (See discussion of this point in part III below.)

It is suggested in the majority opinion that the word ''value'' in section 97 means '' current value '' or '' present value '' but if the Legislature had intended this, it could easily have said so. There is no reference in the statute to present value or current value, nor is there any reference to reproduction cost. There is no provision in the statute that value shall be determined in any particular way or as of any particular time. There is no provision that value shall be determined with due regard to reproduction cost or to current price levels.

The emphasis in the statute is upon the fixing of '' just and reasonable rates '', with due regard to a reasonable return upon the value of the property of the company used in the public service. How the value is to be arrived at is left to the Public Service Commission to determine, subject only to the requirement that its determination be a just and reasonable one so that the resulting rates will be just and reasonable.

The gist of the statutory provision is that in fixing rates the Public Service Commission is to proceed by the rate base method, that is to say, it is to determine the return or the profit to which the company is entitled upon the basis of a return upon a rate

base. As has already been pointed out, the word " value " as used for rate-making purposes has no real connection with value in the ordinary commercial sense at all. The word " value " used in this context means a rate base, or a rate base valuation. " While the courts *talk* in terms of value, they *act* in terms of reasonable rate base " (2 Bonbright on Valuation of Property [1st ed.], p. 1117; *Power Comm.* v. *Hope Gas Co.*, 320 U. S. 591, *supra*). The statute says in substance that due regard is to be given a reasonable return upon a rate base reasonably arrived at. That is the substance of the legislative directive. There are conceivably other methods of determining prices which the Legislature might have adopted. (See, for example, the milk control, rent control and other price fixing statutes; *United States* v. *Rock Royal Co-op.*, 307 U. S. 533; *Block* v. *Hirsh*, 256 U. S. 135, and *Olsen* v. *Nebraska*, 313 U. S. 236.) In ordinary business enterprises, the profit margin is not determined as a percentage return upon the plant investment but rather as a percentage of the selling price or a percentage added to the manufacturing cost. The Legislature directed, with regard to public utility rate making, that the rate base approach should be used and due regard should be given to a return upon a rate base reasonably arrived at, in determining the profit margin of the company.

There can be no question as to the intrinsic reasonableness of an original cost rate base. A system of rate making which is based upon the principle that the investors should at all times receive a fair return upon the amount of their actual investment is obviously fair and reasonable (*Power Comm.* v. *Hope Gas Co., supra*).

Putting aside for the moment the theory that the use of the word " value " constituted an adoption by the Legislature of the doctrine of *Smyth* v. *Ames*, it is clear that the words of the statute do not of themselves mandate the consideration of reproduction cost or forbid the adoption of a rate base determined solely upon the basis of original cost.

## II

### *The alleged adoption of Smyth v. Ames.*

This brings us to the heart of petitioner's case, the contention that, by using the word " value " in the statute, the Legislature necessarily adopted the content of the then prevailing constitutional doctrine of *Smyth* v. *Ames* as a part of the statutory law of this State, without regard to the fate of that doctrine in the

United States Supreme Court. This line of argument is unacceptable for several reasons.

First. As has already been pointed out, the meaning of the doctrine of *Smyth* v. *Ames* was far from settled in 1910. In the words of the leading authority of the time, it was " in a developmental stage " (Whitten, *op. cit., supra,* p. 40). If, by reason of the use of the word " value ", the Legislature is deemed to have adopted a doctrine which was in a developmental stage, it must be deemed to have adopted it with all its potentialities for development. The ultimate development, as we have seen, was the decision in the *Hope* case holding that an original cost rate base fully complied with the requirements of due process.

Second. The crucial term in *Smyth* v. *Ames* was " fair value ", not simply " value ", which is the word used in the New York statute. " Fair value " is the term of art which represented and symbolized the constitutional doctrine laid down in *Smyth* v. *Ames*. Under that doctrine, a public utility was entitled as a matter of constitutional right to a fair return upon the " fair value " of its property. In the term " fair value " as used in *Smyth* v. *Ames*, the key word is the word " fair ". The word " fair " as used in the phrase means that the rate-making authority is to arrive at a judgment figure, after giving consideration to both original cost and reproduction cost. The word thus has a very special significance.

It is only when the adjective " fair " is interposed before the word " value " that we can derive from the phrase, in the light of its history, a requirement that the " value " be arrived at in any particular way. It is only the complete phrase " fair value " that can even arguably be said to give rise to a requirement that reproduction cost be considered. " Fair value " was the term used in *Smyth* v. *Ames* to designate the final conclusion which was to be reached by the rate-making authority in the exercise of its judgment, after having received evidence of different kinds of " value ", including the " value " at the time of dedication (the original cost) and the " value " at current prices (the reproduction cost). The use of the neutral word " value " cannot of itself constitute an adoption of the doctrine of *Smyth* v. *Ames*.

The absence of the complete phrase " fair value " from the New York statute is thus fatal to the petitioner's contention. Recognizing this deficiency in its case, the petitioner seizes upon passages in the opinion in *Smyth* v. *Ames* in which the word " value " is used alone, but it is obvious that in the context these

passages refer to the term " fair value " used earlier in the opinion. There is no basis for the claim that the word " value " of itself represented or symbolized the constitutional doctrine or that the use of that word could constitute an adoption of the doctrine.

Third. Even if we should assume for the purpose of argument that the Legislature intended to refer to the constitutional doctrine of *Smyth* v. *Ames,* in using the word " value " in the 1910 statute, it does not follow that the doctrine remained in effect as a matter of State law, after its repudiation as a matter of constitutional law by the United States Supreme Court.

A close analysis of the petitioner's argument will readily disclose the fallacy inherent in it. The petitioner first assumes that *Smyth* v. *Ames* defined the word " value " as a word, independently of the requirements of due process of law, and then, upon this premise, the petitioner invokes the canon of statutory construction that when words which have been judicially defined are used by the Legislature, they are deemed to have been used in the sense given them by the judicial definition. But *Smyth* v. *Ames* does not contain a definition of the word " value " (or even of the phrase " fair value "), independently of the requirements of due process. On the contrary, the doctrine of the case constituted a definition, not of " value ", but of " due process ". It is true that the word " value " was used in stating the doctrine but the doctrine was not based upon the presence of the word " value " in the Constitution; that word does not appear in the Constitution. Neither did the doctrine rest upon the construction of the word " value " in any Federal or State statute or in any common-law rule; the doctrine was not in anyway related to the words of any statute or rule but was laid down as a matter of constitutional law as a definition of the requirements of due process of law. The statement in *Smyth* v. *Ames* with respect to the meaning of " fair value " is an integral part of the holding by the court as to the requirements of due process and it cannot be divorced from it.

Once this is recognized, there is little left of the petitioner's argument. Then, even if we should assume that the Legislature meant to refer to the constitutional doctrine, in using the word " value ", the reference would be to the Federal doctrine as such. All that we would then have, reading this reference into the statute, would be a direction to the commission to give " due regard to the value of the utility company's property, as determined in accordance with the requirements of due process of law under the United States Constitution ". Such a direction

would not freeze into the New York statute a provision equivalent in content to the content of the then prevailing Federal doctrine, so that it would remain in force even in the event that the doctrine should be abandoned by the United States Supreme Court. So long as the doctrine of *Smyth* v. *Ames* remained in effect, the statute would stand as a direction, or more accurately a reminder, to the commission to take cognizance of the Federal doctrine. But upon the abandonment of the doctrine by the United States Supreme Court, it could no longer serve as a restriction upon the meaning to be given the word " value "; the word could then be given any reasonable construction within the limits of its natural meaning. When the United States Supreme Court changed its interpretation of the Constitution, the range of the constitutionally permissible interpretations of the word " value " was accordingly enlarged.

A helpful analogy may be found in the use of the words " just and reasonable " in statutes regulating public utility rates. This was recently discussed by the Utah Supreme Court in an opinion by Chief Justice WOLFE which has already become a classic. As the Chief Justice pointed out, at the time of the adoption of various State statutes using the words " just and reasonable ", the only rates which could be considered " just and reasonable ", under the due process clause as interpreted in *Smyth* v. *Ames,* were those fixed upon a rate base which took reproduction cost into account. But the words " just and reasonable " did not freeze the constitutional doctrine into the State statutes as a matter of State law. When the doctrine was abandoned, the State regulatory agencies and the State courts were free to find that rates fixed upon original cost were " just and reasonable ". " It would be contrary to common sense to hold that the legislature meant ' just and reasonable ' only as defined by the courts at the time of *Smyth* v. *Ames* and to hold that the legislature would, in order to authorize the Commission to use prudent investment, be required to re-enact the statute saying that it meant ' just and reasonable ' as that term is construed today. To the contrary, it must be assumed that the legislature contemplated that the concept of that which is ' just and reasonable ' might change with social trends." (*Utah Power & Light Co.* v. *Public Service Comm.,* 107 Utah 155, 190–191 [1944].)

This statement is equally applicable to the word " value ", a word which is similar to the words " just and reasonable " in the breadth and flexibility of its meaning. The word " value ", " Like ' reasonableness ' * * * is often used as a term of

approbation '' rather than as a word having a definite meaning (2 Bonbright on Valuation of Property [1st ed.], p. 1171).

It happens that, in this case, reproduction cost is the element of '' value '' under the Federal constitutional doctrine which is in controversy but, at various times during the history of the doctrine, other elements, for which even the petitioner does not now make claim, were considered to be essential elements of '' value '' under the due process clause. For example, Public Service Commissions were at one time required to make an allowance for '' franchise value '' under the due process clause. In fact, this was squarely held in *Willcox* v. *Consolidated Gas Co.* (212 U. S. 19, 43, 44, 48 [1909], *supra*) which is the case relied upon by the petitioner as stating the '' fair value '' doctrine in the form in which the petitioner claims it was adopted by the New York State Legislature in 1910. Under the petitioner's reasoning, the holding of the *Willcox* case upon this point was frozen into the New York State law, even though the Supreme Court later held it to be erroneous (*Georgia Ry.* v. *Railroad Comm.*, 262 U. S. 625, 632 [1923], *supra*; cf. Public Service Law, § 101). Similarly, there was a time when the Supreme Court required an allowance to be made for '' going concern value '' as a separate item in the rate base, under the due process clause (*McCardle* v. *Indianapolis Co.*, 272 U. S. 400, 413–415 [1926], *supra*). According to the petitioner's reasoning, this, too, would have been frozen into the State law, if a statute using the word '' value '' had been adopted while this doctrine prevailed. Later, the Supreme Court held that a separate allowance need not be made for '' going concern value '' (*Dayton P. & L. Co.* v. *Comm.*, 292 U. S. 290 [1934]; *Power Comm.* v. *Pipeline Co.*, 315 U. S. 575, 589 [1942]).

This exposes the basic fallacy in the petitioner's reasoning. Under its reasoning, every mistaken notion as to the meaning of the term '' value '' under the due process clause, which happened to prevail at a time when a rate-making statute using that word was adopted, would be frozen into the State law, even though the Supreme Court should later hold that the notion was erroneous. The obvious answer to the petitioner's reasoning is that, if the word '' value '' in the State statute is deemed to have referred to the Federal constitutional doctrine, it must be deemed to have referred to it with all its potentialities for change. The Supreme Court decisions as to the meaning of the word '' value '' in due process cases cannot be torn from their context and used as definitions apart from the changing concepts of due process.

As those concepts changed, the meaning required to be given to the word " value " likewise changed. The canon of construction upon which the petitioner relies, relating to words which have acquired " a precise and well-settled meaning " as the result of judicial definition (*Perkins* v. *Smith,* 116 N. Y. 441, 448–449), obviously has no application to a problem of the kind here involved.

## III

### *The Legislative Intent*

If we put aside artificial canons of construction and look to the actual intention of the Legislature, it is clear beyond question that there was no intention on the part of the Legislature in 1910 to freeze the reproduction cost theory into the New York State law so that it would remain in force, even in the event that the United States Supreme Court should some day abandon it as a constitutional doctrine. There is not a shred of legislative history to support the finding of such an intention. The evidence is all the other way.

The phrase in section 97 upon which the petitioner focuses attention should not be considered as an isolated phrase; it should be interpreted in the light of the spirit and purpose of the Public Service Law and the settled public policy of the State with respect to public utility regulation.

(A.) From the beginning, the New York State Legislature has made it clear that, if it were free from Federal constitutional restrictions, it would choose actual cost as the basis of rate making. Way back in 1850, when the Legislature adopted the first general statute providing for the formation of railroad corporations and for their regulation (L. 1850, ch. 140), it provided in section 33 of the statute: " The legislature may * * * from time to time, alter or reduce the rate of freight, fare, or other profits upon such road; but the same shall not, without the consent of the corporation, be so reduced as to produce with said profits less than ten per centum per annum on the *capital actually expended* " (Italics added). This provision was continued verbatim in the Railroad Law of 1890 (L. 1890, ch. 565, § 38).

Subsequently, after the Public Service Commission had been created and rate making had been placed under its jurisdiction, sections 49 and 72 of the Public Service Commissions Law were amended by chapter 480 of the Laws of 1910 so as to provide that rates for railroad, gas and electric companies should be pre-

scribed with " due regard among other things to a reasonable average return upon capital actually expended ". Similar provisions were adopted subsequently with respect to steam, water and omnibus companies. This was all done in the face of the then prevailing constitutional doctrine which required consideration of reproduction cost. Notwithstanding this doctrine, the New York State Legislature authorized the commission, so far as the State law was concerned, to determine rates upon the basis of " capital actually expended ". It is true that with respect to telephone and railroad companies the Legislature enacted statutes in 1910 and 1911 using the term " value of the property ", but when this broad term is considered in the light of the rest of the Public Service Law, it is clear that it was not intended to be a deviation from the overall State policy. (See discussion below.) This conclusion is fortified by the statute adopted in 1952 (L. 1952, ch. 508), which is discussed in part IV below, approving the fixing of rates for all public utility companies, expressly including telephone companies and railroads, upon the basis of " capital actually expended ".

(B.) The long struggle of successive Legislatures and of the Governors of the State to escape from the unfortunate consequences of the reproduction cost theory is wholly incompatible with the inferring of an intention on the part of the Legislature to freeze that theory into the State law. In the 1920's, rate regulation in this State had been virtually brought to a standstill by long drawn out litigation with respect to the reproduction cost of the properties involved. The situation became so bad that in 1929 the Legislature created a temporary commission " to make a thorough survey, examination and study of the public service commission laws of this and other states, for the purpose of ascertaining whether the public service commission law of this state accomplishes the objects for which the system of state regulation was established, and for determining what amendment or revision of the public service commission law is essential to guarantee to the public safe and adequate service at just and reasonable rates, to the stockholders of public service corporations, a fair return upon their investments, and to bondholders and other creditors, protection against impairment of the security of their loans ". (L. 1929, ch. 673, § 3.)

In approving the bill creating the temporary commission, Governor Roosevelt said: " The theory of twenty years ago that the return to public service corporations should not exceed a fair profit on the money actually invested is constantly and flagrantly violated. Some method must be found to return to the

original principle." (Public Papers of Governor Roosevelt, 1929, p. 282.)

It will be noted that the statute states that one of the objects for which the system of utility regulation had been established was the assuring to the stockholders of public service corporations of " a fair return upon their investments ". There is no suggestion of an assurance of a return upon the reproduction cost of the property or upon revaluations made in the light of changing price levels. Certainly, the Legislature which adopted this statute did not believe that by any prior statute it had frozen into the State law the requirement of the consideration of reproduction cost.[3] There was general agreement among the members of the temporary commission that effective public utility regulation had been rendered extremely difficult, if not impossible, by the imposition of the reproduction cost theory by the United States Supreme Court. The members devised elaborate plans for the valuation of the property of public utility companies, as of a given time, in order to avoid the constant revaluations required by the Federal doctrine but none of the plans was satisfactory to the Legislature and to the Governor and efforts along that line were abandoned (1 Report of the Commission on Revision of the Public Service Commissions Law [1930], pp. 16–22, 53–55, 263–268, 334–351, 388–392, 403–410).

Finally, in 1934, the Legislature found a method of restoring a measure of effectiveness to rate regulation. By chapter 287 of the Laws of 1934, the Legislature added section 114 to the Public Service Law, which required all public utility companies to keep their books " in such manner as to show currently the original cost " of their property and authorized the Public Service Commission to fix temporary rates " to provide a return of not less than five per centum upon the original cost, less accrued depreciation, of the physical property of said public utility company used and useful in the public service ". The Legislature thus expressed its desire to have rate making put upon an original cost basis but it recognized that, under the doctrine of *Smyth* v. *Ames* then prevailing, the commission would have to consider reproduction cost in fixing the final rates and it

(3) Subsequently enacted statutes may properly be considered in determining the meaning of a statute. " Acts *in pari materia,* passed before or after, may be referred to, in order to ascertain the intent of the Legislature in the use of particular terms " (*Chase* v. *Lord,* 77 N. Y. 1, 18; *New York Central & Hudson Riv. R. R. Co.* v. *Williams,* 199 N. Y. 108, 113–114; McKinney's Cons. Laws of N. Y., Book 1, Statutes [1942 ed.], § 223).

provided that the commission should take into account any loss suffered by the company, during the period of the operation of the temporary rates, in the fixing of the final rates. The constitutionality of the temporary rate statute was upheld in *Matter of Bronx Gas & Elec. Co.* v. *Maltbie* (271 N. Y. 364 [1936]).

A similar statute adopted in Pennsylvania was upheld by the United States Supreme Court in *Driscoll* v. *Edison Co.* (307 U. S. 104 [1939]). Mr. Justice FRANKFURTER, in a concurring opinion, recognized the legislative motivation in a significant statement, at page 123: "The statute under which the present case arose represents an effort to escape *Smyth* v. *Ames* at least as to temporary rates. It is the result of a conscientious and informed endeavor to meet difficulties engendered by legal doctrines which have been widely rejected by the great weight of economic opinion, by authoritative legislative investigations, by utility commissions throughout the country, and by impressive judicial dissents." (See, also, *New England Tel. & Tel. Co.* v. *State*, 95 N. H. 353 [1949].)

(C.) *The strongest evidence* against the inferring, from the use of the term "value of the property", of an intention to freeze the reproduction cost theory into New York State law, is found in the fact that the Legislature did not use this term for all public utilities but used it only with respect to railroad and telephone companies and used the term "capital actually expended" with respect to all other public utilities. Whatever plausibility the petitioner's argument might have had if the Legislature had used the term "value of the property" in prescribing the rate base for all public utility companies, it has none in this situation.[4]

If the Legislature had intended to freeze reproduction cost into the State law, it certainly would have done so for all public utilities alike. No rational basis can be found for differentiating the rate base principle of telephone companies from that of gas, electric, steam and water companies. No effort has been made by the petitioner to sustain the rationality of such a distinction. All the economic and legal arguments which can be advanced for the use of reproduction cost in determining the rate base

---

(4) It is noteworthy that, in none of the cases in other jurisdictions cited in the majority opinion in which the reproduction cost theory was adhered to, was a situation presented comparable to ours. In no State in the country has it ever been held, upon the basis of statutory construction, that reproduction cost must be considered as to certain specified types of utilities, while, as to other utilities, it need not be considered and an original cost rate base may be used.

of a telephone company are equally applicable to gas and electric companies. Yet, at the same session of the Legislature as that which adopted section 97, a provision was inserted in section 72 of the Public Service Law to the effect that the rates for gas and electric companies should be fixed upon the basis of " capital actually expended ". (L. 1910, chs. 480, 673.)

The Legislature is presumed to have acted rationally (*Matter of Breen* v. *New York Fire Dept. Pension Fund,* 299 N. Y. 8, 19) and it must, therefore, be presumed that the Legislature intended that all public utility companies should be on the same footing.

The words " capital actually expended " used with respect to gas, electric, steam and water companies have a fixed meaning. There is no possibility of construing those words as mandating consideration of reproduction cost at current prices. As to the public utilities governed by statutes using the words " capital actually expended ", there can be no question but that, so far as State law is concerned, the Public Service Commission is authorized to adopt an original cost rate base. On the other hand, the words " value of the property " have a broad and flexible meaning and are susceptible to different constructions. The construing of those words as mandating the consideration of reproduction cost results in an irrational distinction between telephone and railroad companies on the one hand and gas, electric, steam and water companies on the other. This unreasonable result can be avoided only by construing the words " value of the property " as permitting the use of an original cost rate base. As we have seen, the words are susceptible to that construction and, since the construction is the only one which makes it possible to put telephone and railroad companies and all other utility companies on the same footing, it is the construction which should be adopted.

We have here a situation in which words of fixed meaning are used as to the rate base of some public utility companies and words of broad and flexible meaning are used as to the rate base of others and there appears to be no rational basis for distinguishing between the different kinds of public utility companies. The only reasonable solution in this situation is to take the words of fixed meaning as the controlling ones.

As a matter of fact, on occasion, the Legislature has used the terms " value of the property " and " capital actually expended " interchangeably, with respect to the *same* type of public utility, indicating that it regarded the two terms as having

the same meaning, so far as the power of the Public Service Commission to adopt an original cost rate base under State law was concerned. When the Legislature added a subdivision (subd. 16) to section 66 of the Public Service Law with respect to gas and electric companies so as to provide for a sliding scale adjustment of rates, the Legislature used the words '' fair value of the property '' to describe the company's rate base although it had used the term '' capital actually expended '' in the basic rate-making provision which governed gas and electric companies (L. 1936, ch. 655). The statutes governing street railroad corporations operating omnibus lines provide another illustration. The rate-making provision for street railroads, section 49, refers to the '' value of the property ''. Under section 50-a of the Public Service Law, street railroad corporations are authorized to substitute omnibuses for street cars, upon obtaining appropriate local and State consents. Under section 63-b of the Public Service Law, the rates of omnibus corporations are to be determined upon the basis of '' capital actually expended''. Here again, the Legislature must have regarded the two phrases as interchangeable, since it obviously could not have intended that the rates of street railroad corporations operating omnibus lines should be determined differently from the rates of omnibus corporations operating omnibus lines.

That the Legislature did not intend to give the term ''value of the property '' in section 97 the significance contended for by the petitioner, further appears from chapter 508 of the Laws of 1952, amending the Condemnation Law, which is discussed in part IV below. The Legislature there described the rate-making process for all public utility companies, including telephone companies, as being based upon the '' capital actually expended ''. Obviously, the Legislature did not regard the words '' value of the property '' in section 97 as having any contrary significance or as forbidding the Public Service Commission to use an original cost rate base for telephone companies.

The explanation of the Legislature's use of the word '' value '' in the telephone and railroad sections rather than the words '' capital actually expended '' which it used in the gas and electric sections, is lost in obscurity. It appears that a comprehensive study had been made of telephone and telegraph companies by a legislative commission and that the commission had recommended that these companies be brought under regulation by the Public Service Commission (Report of Joint Committee to Investigate Telephone and Telegraph Companies [1910]).

The bill, as introduced upon the recommendation of the joint committee, referred simply to the fixing of " just and reasonable " rates. However, during the course of passage in the Legislature, the words, the meaning of which is here in controversy, were inserted. It is idle to speculate as to the motives which influenced the draftsman or the individual legislator who introduced the amendment to the bill. So far as appears from the record, the Legislature's attention was not directed to this change as having any special significance. As we have noted above, the Legislature at various times used the terms " value of the property " and " capital actually expended " interchangeably, with respect to the same public utilities. The Legislature in 1910 apparently regarded the two terms as having substantially the same meaning, so far as the authority of the Public Service Commission under State law was concerned.[5]

If the word " value " is given its ordinary significance as a broad term authorizing the regulatory agency to adopt any reasonable method of arriving at a conclusion as to " value ", there is no difficulty in reconciling the two phrases. The word " value " so construed is broad enough to authorize the commission to use an original cost rate base, and the words " capital actually expended " specifically authorize the same kind of rate base.

(5) The railroad bill amending section 49 of the Public Service Law (L. 1911, ch. 546), to which special attention is directed in the majority opinion, had a curious history. A bill was introduced at the 1911 session of the Legislature to amend section 49 so as to authorize the Public Service Commission to regulate excursion, family, commutation, half fare or other forms of reduced rate tickets. In the bill in its original form, the rate-making provisions of section 49 were repeated without change, as they had been last amended in the general revision of the Public Service Commissions Law by chapter 480 of the Laws of 1910, using the words " capital actually expended". During the course of passage in the Legislature, the bill was amended to substitute the words "value of the property actually used in the public service" for the words "capital actually expended". So far as the record shows, no special significance was attached to the change. The bill was passed as a bill to provide for the regulation of reduced fare tickets. In these circumstances, it is certainly not reasonable to read into the equivocal term "value of the property" a deliberate decision by the Legislature to alter the fundamental rate-making policy of the State. It is noteworthy that when Governor Dix signed the bill, he treated the difference in phraseology as a purely verbal one which did not deter him from signing the bill, although he expressed the view that, in the interests of verbal consistency, the gas and electric and the telephone and railroad statutes ought to be made uniform (Public Papers of Governor Dix [1911], pp. 339–340).

Furthermore, even if we assume that in using the word " value " in the telephone and railroad statutes, the Legislature intended to refer to the doctrine of *Smyth* v. *Ames* as a Federal constitutional doctrine, in accordance with the analysis made in part II above, there is still no inconsistency between those statutes and the statutes governing gas, electric, water and steam companies. Under this interpretation, by the use of the word " value ", the Legislature indicated that the rate base was to be determined in accordance with the concepts of " value " laid down by the United States Supreme Court under the due process clause, as those concepts might prevail from time to time. The Legislature did not interpose a similar reminder with respect to the rates of gas, electric, water and steam companies but, of course, the prevailing constitutional doctrine was nevertheless applicable to them. In this situation, when the doctrine requiring the consideration of reproduction cost was overruled by the United States Supreme Court, the doctrine ceased to be applicable to telephone and railroad companies as well as to gas, electric, water and steam companies.

Inconsistency between the term " value " in one type of statute and the term " capital actually expended " in the other type arises only if the term " value " is construed as mandating the consideration of reproduction cost, even after the abandonment of the constitutional doctrine. As has already been pointed out, no rational basis for such an inconsistent result can be found and it is not a necessary or unavoidable result of the language used by the Legislature. We must, therefore, reject the construction which produces the irrational result and adopt the construction which reconciles all the statutes into a single and harmonious whole.

## IV

### *The controlling force of chapter 508 of the Laws of 1952*

The Public Service Commission of this State had long advocated the use of an original cost rate base but it had been required, under the decisions of the United States Supreme Court, to receive evidence of reproduction cost as well. After the constitutional requirement was repudiated in the *Hope* case in 1944, the Public Service Commission was free to use original cost as the sole standard of value in rate cases. The Public Service Commission thereafter fixed rates upon the basis of

original cost exclusively.[6] Rate making upon the basis of actual cost had become firmly established in this State for all public utilities, including telephone companies, by 1952. Specifically with respect to the rates of New York Telephone Company, the commission had held in 1951 that reproduction cost evidence would not be received and that the value of the company's property for rate-making purposes would be determined solely upon the basis of actual cost. The arguments based upon the language of section 97 now advanced were fully presented to the commission and were rejected by it (Matter of New York Tel. Co., 91 P. U. R. [N. S.] 231, 255, 256 [1951]). Subsequently, the case was reopened and a partial rate increase was granted to the telephone company because of an increase in taxes and operating expenses but the holding of the 1951 opinion was not in anyway qualified. The company did not seek judicial review of that decision. It stood as the established administrative interpretation when, in 1952, a question arose in the Legislature as to the practice of the courts in condemnation proceedings affecting public utility companies. The Legislature found that "inadequate consideration [had been] given to the regulated nature of the owner's property and business and its previous dedication to the public use" and to the fact that the Public Service Commission had established the practice of prescribing rates for such companies upon the basis of a reasonable return "upon capital actually expended" (L. 1952, ch. 508, § 1; see, also, L. 1952, ch. 515). In 1952, the use of an original cost rate base for all public utility companies was well settled and, as has been pointed out, this method of rate making had been applied to the New York Telephone Company in the 1951 rate case. With this settled practice before it, the Legislature approved this method of rate making and directed that it be brought to the attention of the courts in condemnation cases so that due consideration would be given to the income which public utility companies could be expected to earn upon the basis of original cost. Section 1 of chapter 508 of the Laws of 1952 provided in part: "It is therefore intended   *   *   *   without attempting to mandate the basis of valuation to be followed, to direct the attention

(6) Matter of Consolidated Edison Co., 96 P. U. R. (N. S.) 194 (1952); Matter of Rochester Tel. Corp., 92 P. U. R. (N. S.) 33 (1952); Matter of New York Tel. Co., 84 P. U. R. (N. S.) 267 (1950); Matter of Ripley Water Supply Co., 74 P. U. R. (N. S.) 446 (1948); Matter of Rochester Tr. Corp., 72 P. U. R. (N. S.) 455 (1948); Matter of Kings Co. Lighting Co., 70 P. U. R. (N. S.) 374 (1947); Matter of Staten Island Edison Corp., 60 P. U. R. (N. S.) 385 (1945).

of the courts and commissioners of appraisal to the general desirability of the result derived by capitalizing the income which the private company could be expected to earn while subject to regulation as a public utility from rates fixed with due regard among other things to a reasonable average return upon capital actually expended, as last ordered, authorized or otherwise determined by the public service commission in connection with companies subject to regulation pursuant to articles two, three, four, four-a, four-b and five of the public service law.''

A new section was added to the Condemnation Law, known as section 5-a, providing that '' In any proceeding to condemn property owned by a person or corporation subject to the jurisdiction, supervision and regulation of the public service commission '', the commission shall certify '' the annual earnings which might reasonably be anticipated by the present owner thereof pursuant to just and reasonable rates, with due regard among other things to a reasonable average return upon capital actually expended ''.

Section 14 of the Condemnation Law was amended so as to require the commissioners in the condemnation proceeding to give '' due regard, in the case of a company subject to the jurisdiction, supervision and regulation of the public service commission, to the anticipated earnings of such company as certified to the court by such commission ''. The quoted language was amended by chapter 414 of the Laws of 1953 without change of meaning so far as is here relevant.

The 1952 statute really puts an end to speculation as to the intention of the Legislature in 1910. Whatever argument may be made as to the intention of the Legislature in 1910, it is clear from the latest expression of the Legislature in 1952 that rate making upon the basis of an original cost rate base meets with the approval of the Legislature. That this applies to telephone companies as well as to other public utility companies appears from the portion of section 1 of the session law quoted above. Section 1 refers to companies subject to regulation pursuant to article 5 of the Public Service Law; this is the article governing the regulation of telephone companies, of which section 97 is a part.

The statute refers to the fact that the earnings of public utility companies are being determined by the Public Service Commission, upon the basis of a fair return on the '' capital actually expended ''. This language approves an original cost rate base. Apart from this specific language, the prevailing administrative construction of the rate-making statutes known to the Legisla-

ture must be deemed to have been approved by the Legislature in the enactment of the 1952 statute (*Matter of Cole,* 235 N. Y. 48).

What is plain enough on the face of the statutes is made crystal clear in the memorandum submitted to the Governor by the Public Service Commission in support of its recommendation that he approve the bill. The memorandum, prepared by Mr. L. E. Walsh, then Counsel to the Public Service Commission and now a United States District Court Judge, read in part as follows: " The recitals of fact in Section 1 of the bill show the reasons for its enactment; make clear that it does not impose a mandatory basis of valuation; show legislative recognition of (a) the effect on value of public utility property of its regulated nature and previous dedication to the public use and (b) the general desirability in valuing that unique type of property by a capitalization of its earnings; and *legislative approval of the fixing of public utility rates with due regard to a reasonable return on capital actually expended, as heretofore practiced by the Public Service Commission* in the case of railroads, street railroads and common carriers, gas and electric corporations, steam corporations, water corporations and *telephone and telegraph corporations* ". (Italics added.) (Governor's Bill Jacket for L. 1952, ch. 508, New York State Library, Legislative Reference Section, Albany, N. Y.)

For a comprehensive and illuminating discussion of the impact of the 1952 statute on condemnation proceedings, see the recent decision of the Appellate Division, Fourth Department, in *Onondaga Co. Water Auth.* v. *New York Water Service Corp.* (285 App. Div. 655). The Appellate Division reversed the condemnation award upon the ground, among others, that the commissioners had failed to give due regard to the prospective earnings and rate base certified by the Public Service Commission under the 1952 statute. (See, also, Condemnation of Public Utilities: A New York Statute and a New Approach, 54 Col. L. Rev. 916.)

There is a reference in Presiding Justice Foster's opinion to the fact that, in the 1952 statute, the Legislature stated that it was not " attempting to mandate the basis of valuation to be followed ". This obviously refers to the valuation in condemnation proceedings, not to the valuation for rate-making purposes. The Legislature recognized that the method of valuation for rate-making purposes was well established and that rates of public utility companies were being fixed upon the basis of a " return upon capital actually expended ". But the Legislature

recognized further that valuation for condemnation purposes was solely a judicial function (N. Y. Const., art. I, § 7, subd. [b]) and that it could not direct the courts to adopt the same basis of valuation as that which it had approved for rate making. However, the Legislature went as far as it could in that direction, by urging the commissioners and the courts to give due regard to the established method of rate-making valuation, in arriving at the valuation of public utility property in condemnation proceedings.

The Legislature apparently saw no need to amend the rate-making statutes in order to enable the Public Service Commission to take advantage of the new freedom of action conferred upon it by the overruling of *Smyth* v. *Ames.* The Legislature was familiar with the fact that the Public Service Commission, ever since the *Hope* case, had fixed rates solely upon the basis of original cost and it was obviously in agreement with that practice. It saw no inconsistency between that practice and the terms of any of the rate-making sections of the Public Service Law.

Even if we should assume that the Legislature was wrong in its belief and that the only reasonable construction of section 97 was the one requiring consideration of reproduction cost, the statute adopted by the Legislature in 1952, specifically approving the use of an original cost rate base, would nevertheless be controlling. It would have the effect of overriding the assumed construction. A subsequent declaration by the Legislature as to the meaning which should be given to a prior statute is binding with respect to the future operation of the statute. " The Legislature may likewise declare by statute the true meaning of a previous statute, and while such a declaration will have no controlling effect in causes which had already arisen, it will lay down a new rule of construction for the future " (McKinney's Cons. Laws of N. Y., Book 1 Statutes [1942 ed.], § 75; cf. *Matter of Chatlos* v. *McGoldrick,* 302 N. Y. 380, 388).

The 1952 statute is the only expression by the Legislature on the subject since the United States Supreme Court in 1944 released its grip upon the rate-making process. We ought to follow that expression rather than to strain to find in the equivocal language of a 1910 statute, a meaning which resurrects and reimposes an outmoded rate-making theory, which had hamstrung public utility regulation for a generation.

The determination of the Public Service Commission should be confirmed, with costs.

Coon and Imrie, JJ., concur with Foster, P. J.; Bergan, J., dissents, in an opinion, in which Halpern, J., concurs; Halpern, J., dissents, in an opinion, in which Bergan, J., concurs.

Determination and orders of the Public Service Commission annulled, with $50 costs and disbursements, and matter remitted to the commission.